## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **SAMUEL LLAMAS,** | |
| **Plaintiff,** | |
| **v.** | **Case No.  19-3180-DDC** |
| **SHANNON MEYER,** *Lansing Correctional Facility Warden*, | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

This matter comes before the court on petitioner Samuel Llamas's pro se[1] Petition for Writ of Habeas Corpus (Doc. 1) and the State of Kansas's Answer and Return (Doc. 11).  Mr. Llamas challenges his state court convictions and sentence for two criminal counts:  (1) felony murder; and (2) criminal discharge of a firearm at an occupied vehicle.

Mr. Llamas asserts five grounds for relief:  (1) there was insufficient evidence that he aided or abetted Michael Navarro in the killing of Omar Flores; (2) the state trial court erred by limiting the accomplice testimony instruction to a single witness; (3) the state trial court erred when it failed to include additional language about "mere association or presence" in the jury instruction on aiding and abetting; (4) at trial, he was denied his Sixth Amendment right to effective assistance of counsel; and (5) the trial court erred by holding that he was not entitled to a new trial based on newly discovered evidence.  For reasons explained below, none of these grounds warrant relief, and so the court denies his Petition.

---

[1]  Because Mr. Llamas proceeds pro se, the court construes his filings liberally.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

## I.      Legal Standard Governing Federal Habeas Petitions

A federal court reviews a state prisoner's challenge to matters decided in state court proceedings under the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *Lockett v. Trammell*, 711 F.3d 1218, 1230 (10th Cir. 2013).  This act "requires federal courts to give significant deference to state court decisions" on the merits.  *Id.*  A federal court may not grant a state prisoner habeas relief for "any claim that was adjudicated on the merits in State court proceedings" unless the prisoner can show one of the following:  (1) that the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)–(2).

The phrase "'[c]learly established [Federal] law'" refers to Supreme Court holdings, but not dicta.  *Lockett*, 711 F.3d at 1231 (quoting *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008)).  An adjudication is "'contrary to' a clearly established law if it 'applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'"  *Id.* (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  And, an adjudication is "an 'unreasonable application' of clearly established federal law if it 'identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of petitioner's case.'"  *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)).  To determine whether a state court unreasonably applied clearly established precedent, the court considers the specificity of the governing legal rule.  *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014).  "The more general the rule . . . the more

leeway [state] courts have in reaching outcomes in case-by-case determinations." *Id.* (citations and internal quotation marks omitted). Federal habeas relief is appropriate "only when the petitioner shows there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* (citation and internal quotation marks omitted).

A factual determination "made by a State court shall be presumed to be correct" unless petitioner presents clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *see also Cockrell*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless [it is] objectively unreasonable in light of the evidence presented in the state-court proceeding." (citations omitted)). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). But, the court applies a different standard to ineffective assistance of counsel claims. "[I]n a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)." *Strickland v. Washington*, 466 U.S. 668, 698 (1984). "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction" has two elements:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

*Id.* at 687. "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.*

## II.      Factual Background

The Kansas Supreme Court summarized the facts of Mr. Llamas's state court convictions

as follows:

> During the summer of 2009, Navarro and Flores agreed to deal methamphetamine.
> Flores provided Navarro a train ticket to California, where Navarro was to purchase
> drugs.  Navarro partially paid for the drugs with money supplied by his girlfriend
> Ruby Camarena.  Navarro's California source fronted the remaining amount.
> Navarro returned to Kansas and delivered the methamphetamine to Flores on July
> 4, 2009.  Flores agreed to pay Navarro when he sold the drugs and also promised
> that another individual, Matthew Miller, would pay for the drugs if Flores was
> unable to do so.

> In the days following the July 4 transaction, Flores did not pay Navarro.  The
> California source began calling about the "fronted" money Navarro still owed for
> the drugs, and Navarro became increasingly angry at Flores.  Navarro repeatedly
> called Flores' cell phone, but Flores did not answer.  It was "like he disappeared."
> Navarro believed Flores was avoiding him, so he told his friends, including Llamas,
> to notify him if they saw Flores because he had "unfinished business" with Flores.
> During this time, Navarro would "hang out" almost daily with a group of friends
> that frequently included Llamas and Navarro's girlfriend's brother, Michael
> Camarena.  (Michael and Ruby Camarena will be referred to by their first names to
> avoid confusion.)  Navarro repeatedly told these friends that "something was going
> to happen to Mr. Flores if he did not give him the money."

> At one point, Ruby, who lived with Navarro in Emporia and frequently served as
> Navarro's translator, went with Navarro to see Miller in an attempt to collect the
> money from him.  Miller refused to pay.

> Sometime later, Navarro received word from Michael that Flores was near a
> restaurant in Emporia where Michael and his friend Joseph Meyers were eating.
> Navarro, Llamas, and Llamas' cousin drove to the restaurant.  Navarro got out of
> the car and confronted Flores, who was sitting in his white Suburban.  Llamas and
> his cousin remained in the car, and Michael and others gathered nearby.  When
> Navarro rejoined his friends, he reported that he had given Flores "additional time
> to come up with the money" but had told Flores that he "better pay" or "he would
> mess him up."

> When Flores still did not pay, Navarro asked Llamas to impersonate the California
> drug source and call Miller.  The purpose of the call was to intimidate Miller into
> finding Flores and "letting him know how he felt and what the situation was."
> According to Miller, the person on the phone identified himself as "Joe."  He asked
> for Flores' location and said Flores owed him money.  The caller's tone was

"convincing" and "firm," and he told Miller that "he was going to get his money one way or another."  Miller subsequently told Flores about the phone call.

Navarro also continued to look for Flores.  Llamas and Navarro's other friends—basically whoever was "hanging out at the time"—frequently accompanied Navarro as he would drive around Emporia looking for Flores.  As time passed, Navarro became increasingly agitated and told his friends, including Llamas, he was going to kill Flores.  Despite these statements, Michael and Meyers testified they did not believe Navarro would kill Flores but thought "at the worst [Flores] was going to get beat up."

On September 8, 2009, Meyers called Ruby on her cell phone.  Because Navarro did not have his own cell phone, Meyers asked Ruby to tell Navarro that Flores had been seen in Emporia.  Meyers also gave her specifics about Flores' location.  Ruby relayed the information to Navarro, who went into the garage where, according to Ruby, he kept a couple of rifles, referred to as "long guns" or "long rifles."  Michael, who disposed of one of the rifles in a local river after Flores' death, described the rifle to the jury as a semi-automatic .22 caliber "long rifle" with a wood stock and steel barrel that was "as long as my arm spread."  Navarro left his house, driving a silver Honda Civic.

Navarro picked up Llamas and drove toward the location where Flores had been seen.  Navarro spotted Flores' white Suburban, which he followed to a motel.  Descriptions of what transpired at that point were given to the jury through the testimony of Michael, who was told about the incident by Llamas; the motel owner, who observed some of the incident; and law enforcement officers, who told the jury about statements made to them by Llamas and the motel owner.

Michael testified that Llamas told him Navarro got out of the car with the rifle.  In response to a question by the prosecutor, Michael agreed that Llamas "was well aware that there was a rifle" in the Honda.  Navarro confronted Flores, who stepped toward Navarro while grabbing for the rifle.  Navarro shot Flores from the side and "then started unleashing on him."  Llamas told Michael, "[I]t was like a movie or it was like—it was unreal. . . .  [Llamas] didn't really believe it was happening."  Llamas told Michael that after the shooting "Llamas did not get back in the vehicle with Mr. Navarro, that Mr. Navarro drove the vehicle away and Mr. Llamas had walked and met up at the gas station to get something to drink."

According to the testimony of a law enforcement officer, Llamas initially gave a much different version of events when he agreed to talk to law enforcement officers approximately 1 week after the shooting; he denied any knowledge other than what he had read in the newspaper.  When confronted with a "still shot" taken from a convenience store video that showed him entering the store with Navarro a few minutes after the shooting, Llamas admitted to being present.  He told officers that Navarro picked him up so they could go to a store to buy beer.  While driving, Navarro spotted Flores and started following him.  Llamas said he told Navarro

they should get the beer and go home, but Navarro wanted to talk to Flores. Llamas told officers that he stayed in the car while Navarro got out and talked to Flores. When Llamas heard the gunshots, he panicked, got out of the car, and ran. Navarro pulled up to him in the Honda and told him to get in the car, but Llamas refused. According to Llamas, Navarro told him that if he said anything about what had happened to Flores, the same thing would happen to him. Llamas said he walked to the nearby convenience store, and Navarro caught up with him.

The motel owner, who witnessed the scene after the shots were fired, told law enforcement officers that he saw a Honda, a Suburban, and two men standing outside the vehicles. One man was standing near the driver's door of the Suburban and the other near the driver's door of the Honda. Both men got into the Honda after the shooting. The person who was near the Suburban got into the Honda's front passenger's seat, the other person got into the driver's seat. In his trial testimony, the motel owner was not as specific regarding the movement of the two men but did testify he saw two men get into the Honda.

The jury also learned that emergency personnel found Flores in the driver's seat of his Suburban, slumped over the center console. The doors were closed, but the driver's side window was rolled down. Based on the blood spatter and Flores' position, investigators concluded the shooting either began or continued through the open window. While there was blood outside the vehicle as well, investigators could not determine if it was left when Flores was pulled out of his vehicle for emergency medical treatment or was the result of wounds sustained while Flores stood outside the vehicle. Flores was shot four times in the head, six times in the torso, and once in the arm with a .22 caliber weapon.

The jury also heard a law enforcement officer testify about the contents of a surveillance tape that showed the view from several cameras located in the convenience store near the motel; the tape included a time stamp. Approximately 2 minutes after the 911 call reporting shots being fired at the motel, Navarro and Llamas "walk[ed] casually up to the door" of the store while Llamas used his cell phone. The cameras captured Navarro and Llamas walking into the store together and moving to the back of the store near the coolers. Approximately 1 minute later, Navarro walked to the front of the store, looked out the door, and then returned to the coolers. Then, both Navarro and Llamas returned to the front of the store with two drinks, which Llamas purchased with cash. Navarro left the store, but Llamas remained and played a video game for 2 to 3 minutes.

Cell phone records were also admitted into evidence. These established that Llamas called his uncle at the time he and Navarro were approaching the convenience store; Llamas' uncle testified that Llamas asked him for a ride. The cell phone records also established that Llamas called Ruby's cell phone less than 50 minutes after the 911 call was logged. Several days later, Llamas called Navarro in Mexico, where Navarro had gone just days after the shooting.

The State pursued an aiding and abetting theory and charged Llamas with one count of felony murder, in violation of [Kan. Stat. Ann. §] 21-3401(b), and one count of criminal discharge of a firearm at an occupied vehicle, in violation of [Kan. Stat. Ann. §] 21-4219(b).  The State granted derivative use immunity, see [Kan. Stat. Ann. §] 22-3415(b)(2) and (c), to several witnesses who testified at trial, including Ruby, Michael, and Meyers.  A jury convicted Llamas as charged.  He received a controlling sentence of life imprisonment without the possibility of parole for 20 years.

*State v. Llamas*, 311 P.3d 399, 402–405 (Kan. 2013).

Mr. Llamas appealed his convictions to the Kansas Supreme Court.  He raised the following legal issues:  (1) the trial court erred by denying his motion for acquittal because there was insufficient evidence that he aided or abetted Navarro in the killing of Flores; (2) the trial court erred by limiting the accomplice testimony instruction because Ruby Camarena also was an accomplice to the crime but wasn't named on that instruction; and (3) the trial court erred by failing to provide the jury with "mere association or presence" language in the jury instruction on aiding and abetting.  *Id.* at 402.  On October 25, 2013, the Kansas Supreme Court, over the dissent of three justices, rejected these arguments and affirmed Mr. Llamas's convictions.  *Id.* at 402, 405–412.

Mr. Llamas then filed a motion for post-conviction relief under Kan. Stat. Ann. § 60-1507 (habeas corpus) in the District Court of Lyon County, Kansas.  On November 23, 2016, the district court held a preliminary hearing and dismissed all but two issues.  The district court granted an evidentiary hearing on those two issues:  (1) ineffective assistance of counsel for failing to produce a video at trial and (2) a request for a new trial based on newly discovered evidence.  The district court held the evidentiary hearing on August 2 and 7, 2017.  On September 22, 2017, the district court denied relief.

Mr. Llamas appealed the district court's decision to the Kansas Court of Appeals claiming, relevant to his Petition here, that:  (1) the district court erred in finding that trial

counsel was effective despite the fact that counsel failed to present a potentially exculpatory video, and (2) the trial court erred by holding that he was not entitled to a new trial based on newly discovered evidence. *Llamas v. State*, 430 P.3d 489 (Table), No. 118,641, 2018 WL 6005154, at *2–3 (Kan. Ct. App. Nov. 16, 2018) (unpublished disposition).

Specifically, Mr. Llamas claimed his attorney, Mark Manna, was ineffective because "he failed to locate a nearby car dealership video that showed [Mr. Llamas] 'walked/ran' from the crime scene." *Id.* at *2. The 911 call after shots were fired was placed at 8:11 and, about two minutes later, Navarro and Llamas walked into the convenience store together. *Id.* at *3. The time stamp on the car dealership footage showed "the outline of a person moving right to left . . . for a couple of seconds" at the 8:25 mark. *Id.* Manna testified he hadn't noticed the shadowy figure on the footage until Mr. Llamas's habeas corpus counsel pointed it out to him. *Id.* He testified that when he prepared for trial, he hadn't seen anything relevant to the case in the car dealership footage, though, in retrospect, it "could have assisted the defense." *Id.* And, Manna "indicated it was possible this could have supported the defense theory that [Mr.] Llamas left the scene and walked toward the convenience store," but the video didn't reveal the identity of the figure, the jury still would see Navarro and Mr. Llamas walking into the convenience store together, and the video would have presented the jury with an inconsistent time frame to reconcile. *Id.* at *3–4.

Next, the Court of Appeals explained that while Mr. Llamas was pursuing his direct appeals to the Kansas Supreme Court, "the State tracked down Navarro in Mexico and extradited him back to Kansas[.]" *Id.* at *2. Navarro pleaded guilty to felony murder. *Id.* And, Mr. Llamas argued that he should receive a new trial because Navarro testified post-extradition that

Mr. Llamas was not involved in the shooting.  *Id.* at \*4–5.  Mr. Llamas asserted Navarro's statements constitute newly discovered evidence.  *Id.* at \*7.

The Kansas district court had heard testimony from Navarro at the § 60-1507 hearing, which contained some inconsistences.  *Id.* at \*4.  Navarro testified that "he asked Llamas to accompany him on a task, but he did not tell him what the task was."  *Id.*  According to Navarro, Mr. Llamas was a mere passenger, and didn't know Navarro's plan to find Flores.  *Id.*  And, he testified that Mr. Llamas left the scene before or while Flores and Navarro were arguing, and before Navarro retrieved the gun.  *Id.*  Navarro also told his attorney that Mr. Llamas was drunk the day of the event "and did not know anything."  *Id.* at \*5.  Navarro explained he went to Mexico after the shooting and remained there during Mr. Llamas's criminal trial.  *Id.*  Navarro's recounting of the events conflicted in some ways with how Mr. Llamas had recounted the events to the lead investigator back in 2009.  *Id.*  And, the district court didn't find Navarro to be a credible witness.  *Id.*

On November 16, 2018, the Kansas Court of Appeals affirmed the decision denying of Mr. Llamas's Kan. Stat. Ann. § 60-1507 motion.  *Id.* at \*1, 6–8.  Mr. Llamas petitioned the Kansas Supreme Court for review.  On July 22, 2019, the Kansas Supreme Court denied review.

On September 12, 2019, Mr. Llamas, having exhausted his available state court remedies, filed an action in our court seeking federal habeas corpus relief under 28 U.S.C. § 2254.

### III.    Analysis

As stated in his Petition, Mr. Llamas raises five grounds for relief.  The court addresses each of them, in turn, below.

**A.** <u>**Ground One**</u>**:  Insufficient Evidence That Mr. Llamas Aided or Abetted Michael Navarro in the Killing of Omar Flores**

Mr. Llamas first asserts that there was insufficient evidence for a jury to find that he aided or abetted Navarro in killing Flores.  Doc. 1 at 6–15.  The State asserts that the evidence was sufficient to show that Mr. Llamas "maliciously and intentionally aided and abetted Navarro's discharge of a firearm into an occupied vehicle[,] as required to support [Mr. Llamas's] convictions[.]"  Doc. 11 at 14.

A petitioner may raise a challenge to the sufficiency of the evidence in a federal habeas corpus proceeding under 28 U.S.C. § 2254(d).  A sufficiency of the evidence challenge requires the court to ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  A petitioner is entitled to habeas corpus relief only when "no rational trier of fact could have found proof of guilt beyond a reasonable doubt" based on "the record evidence adduced at the trial."  *Id.* at 324.

"In adopting the rational-factfinder test, the [Supreme] Court made clear that test 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Glossip v. Trammell*, 530 F. App'x 708, 742 (10th Cir. 2013) (quoting *Jackson*, 443 U.S. at 319).  The Supreme Court has "'emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review.'"  *Id.* (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)) (further citation omitted).  Thus, when a factual record supporting conflicting inferences is presented to a federal habeas court, the court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Jackson*, 443

U.S. at 326.  Accordingly, in habeas cases, the court "'may not weigh conflicting evidence nor consider the credibility of witnesses.'"  *Glossip*, 530 F. App'x at 742 (quoting *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996)).

A sufficiency of the evidence challenge begins with "explicit reference to the substantive elements of the criminal offense as defined by state law."  *Thompson v. Allbaugh*, 750 F. App'x 736, 742 (10th Cir. 2018) (citing *Jackson*, 443 U.S. at 324 n.16).  A jury convicted Mr. Llamas of felony murder and criminal discharge of a firearm at an occupied vehicle through an aiding and abetting theory.  *Llamas*, 311 P.3d at 402.  This required finding that Mr. Llamas or another killed Flores; the killing was done while in the commission of the crime of criminal discharge of a firearm at an occupied vehicle; and that Mr. Llamas "intended to aid and abet the discharge of a weapon at an occupied vehicle."  *Id.* at 405–06, 408.

Mr. Llamas argues insufficient evidence existed to support a finding that he intended to aid and abet Navarro in discharging the gun at the vehicle killing Flores.  Doc. 1 at 6.  His argument is two-fold.  *First*, Mr. Llamas contends the Kansas Supreme Court's decision that sufficient evidence existed to support the convictions is contrary to, or an unreasonable application of, the clearly established federal law in *Rosemond v. United States*, 572 U.S. 65 (2014).  *Id.* at 10–11.  *Second*, Mr. Llamas argues the Kansas Supreme Court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  *Id.* at 11–15.

### 1.  Clearly Established Federal Law

Mr. Llamas's first argument suffers from a timing issue.  Mr. Llamas relies on a 2014 Supreme Court decision—*Rosemond*—to argue the 2013 Kansas Supreme Court decision in his criminal appeal was contrary to or an unreasonable application of clearly established federal law. The court can't find that the Kansas Supreme Court's 2013 decision was in violation of clearly

established Supreme Court precedent in *Rosemond* because the Supreme Court hadn't decided *Rosemond* when the Kansas Supreme Court decided Mr. Llamas's appeal. *See Horn v. Kansas*, 788 F. App'x 567, 574 (10th Cir. 2019) ("'Clearly established' requires that the precedent must be in place at the time of the state court decision." (citing *Greene v. Fisher*, 565 U.S. 34, 38 (2011))).

Even if *Rosemond* had been clearly established precedent at the time of the Kansas Supreme Court's decision, Mr. Llamas has failed to establish that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Rosemond* held that a defendant, to be guilty of aiding and abetting an offense that has the use of a firearm as an element of the crime, must have the intent to participate in an offense that involves a gun—*i.e.*, the defendant has the requisite intent only if he "actively participates . . . with full knowledge of the circumstances constituting the charged offense." 572 U.S. at 76–77. If the defendant doesn't know that "one of his confederates will carry a gun[,]" then he lacks the intent necessary to aid and abet such a crime because he hasn't "chosen . . . to align himself with the illegal scheme in its entirety—including its use of a firearm." *Id.* at 77–78. In short, a defendant must have "advance knowledge" about the firearm, "knowledge that enables him to make the relevant legal (and indeed, moral) choice" whether to participate in the crime or to "withdraw from the enterprise." *Id.* at 78. "[W]hen an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime," and under such circumstances, "the defendant has not shown the requisite intent to assist a crime involving a gun." *Id.*

Mr. Llamas contends "[t]he state presented no evidence that Mr. Llamas was ever aware tha[t] Navarro had the rifle with him in the car prior to the shooting." Doc. 1 at 11. So, he

asserts, the Kansas Supreme Court's decision contradicts *Rosemond*. *Id.* at 10–11. But, as described in more detail below, a rational trier of fact could have found Mr. Llamas knew about the gun before the crime was committed with ample time to withdraw his participation. Indeed, Michael Camarena testified that Mr. Llamas saw Navarro get out of the car with the rifle, and "[i]n response to a question by the prosecutor, Michael agreed that Llamas 'was well aware that there was a rifle' in the Honda." *Llamas*, 311 P.3d at 403.

### 2.   Unreasonable Determination of Facts in Light of the Evidence

Next, Mr. Llamas argues the Kansas Supreme Court's decision was based on an unreasonable determination of facts in light of the evidence presented. Doc. 1 at 11. He contends the evidence showed he merely was present when Navarro shot at Flores's car, but it can't support a finding that he aided and abetted Navarro in committing that crime. *Id.* at 11–14. Instead, he asserts, "[t]he evidence at trial was weak and dependent upon inference stacking." *Id.* at 12. And, he asserts this court should side with the three judges who dissented from the Kansas Supreme Court's majority opinion and conclude the evidence was insufficient to support a conviction for discharging a firearm at an occupied vehicle under an aiding and abetting theory.[2] *Id.* at 13. Mr. Llamas's argument relies on a variety of facts that, he contends, show he never aided and abetted Navarro in the charged offenses.

---

[2]      The dissenting judges took the position that "the evidence was insufficient to establish that Navarro committed the underlying felony of criminal discharge of a firearm at an occupied motor vehicle, which would negate the notion that Llamas willingly participated in the commission of that crime, regardless of whatever assistance Llamas may have given Navarro with any other crimes he may have committed." *Llamas*, 311 P.3d at 412. Contrary to Mr. Llamas's position that the evidence was insufficient to show he knew about the gun, the dissenting judges concluded "the jury could have inferred from the evidence. . . that Llamas . . . observed the presence of the firearm, and understood that Navarro planned to use the weapon to either coerce Flores into paying his drug debt or do bodily harm to Flores." *Id.* But, the dissenting judges found the evidence was insufficient to show Llamas knew "Navarro intended to use the rifle to shoot at or damage Flores' vehicle" or that "Llamas willingly participated in furthering such intentions." *Id.* The dissent noted that the evidence "established that the firearm was

Specifically, Mr. Llamas contends the Kansas Supreme Court erred by finding evidence to support his convictions under an aiding and abetting theory because past interactions between Navarro and Flores ended without violence, so "there was no reason for Mr. Llamas to suspect anything would be different" during the encounter at the motel.  *Id.* at 11.  Mr. Llamas argues he didn't know Navarro was going to kill Flores.  *Id.* at 7–8, 11–12.  He was aware that Flores owed Navarro money and that Navarro was upset, but Mr. Llamas points out that when Navarro confronted Flores at the restaurant encounter "[t]he situation ended without violence."  *Id.* at 7. And, while Navarro later had "expressed a desire to kill Flores," and "made threatening comments to his friends about what he would do if he found Flores," Mr. Llamas asserts the evidence showed "no one in Navarro's group took the threat seriously."  *Id.* at 7–8, 11–12.

Plus, Mr. Llamas contends, the prosecutor presented no testimony to show he complied with Navarro's requests for his friends to help find Flores's whereabouts.  *Id.* at 12.  Instead, Mr. Llamas asserts the evidence only showed other individuals helping Navarro—like Joseph Meyers and Ruby Camarena, and Michael Camarena—but he personally didn't inform Navarro of Flores's location, supply the car used the night of the murder, or help dispose of the murder weapon.  *Id.* at 8–9, 12.

_____

discharged *at* Flores, not at his Suburban," because the bullets struck Flores not the car (albeit possibly by Navarro shooting through an open car window).  *Id.* at 412–13.

     In short, contrary to the majority, the dissent interpreted the Kansas statute making it a crime to discharge a firearm at an occupied vehicle not to encompass discharging a firearm at a specific person although the person happens to be sitting in a car when shot.  *Id.* at 413–14.  It is not within the province of this court to reexamine the state court majority's interpretation of the Kansas statute.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (explaining a federal habeas court cannot "reexamine state-court determinations on state-law questions").  The dissent also concluded "the evidence [was] insufficient to support that Llamas aided and abetted the commission of the crime" because "the only reasonable inference to be drawn from the evidence [was] that Llamas formed the intent to drive the getaway car *after* Navarro shot Flores," which constitutes a different offense—aiding a felon.  *Id.* at 414.  As explained below, the court agrees with the majority that sufficient evidence existed to support Mr. Llamas's convictions under an aiding and abetting theory.

Mr. Llamas also contends "there was no evidence to suggest that [he] was even remotely a party to the drug transaction at issue," nor was there any evidence showing he would receive any money if Navarro recovered the debt from Flores. *Id.* at 12. And, Mr. Llamas argues no evidence suggests that he ever tried to intervene or threaten to harm Flores on Navarro's behalf. *Id.* Instead, Mr. Llamas argues Navarro's plan to harm Flores was his own, and he never sought Mr. Llamas's assistance to accomplish it. *Id.*

Finally, Mr. Llamas contends the motel owner's testimony about seeing two persons get into the Honda after the shooting was unreliable. *Id.* at 8. Instead, Mr. Llamas states that "he was shocked that Navarro had opened fire on Flores" and "ran away as quickly as he could." *Id.* But, Navarro followed him to the gas station and threatened Mr. Llamas not to talk to the police. *Id.* And, Mr. Llamas argues the evidence was insufficient to show that he knew Navarro had a gun at the motel parking lot because the gun could have been hidden in the Honda somewhere where Mr. Llamas wouldn't have seen it. *Id.* at 13. Plus, the motel owner never testified that he saw a gun when the two men entered the Honda after the shooting. *Id.* So, Mr. Llamas argues, the state assumed Mr. Llamas knew about the gun, but presented no evidence that he "was ever aware of the gun" until he was already at the motel with Navarro and Flores. *Id.*[3]

The Kansas Supreme Court thoroughly analyzed the sufficiency of the evidence to support Mr. Llamas's conviction for felony murder and criminal discharge of a firearm at an occupied vehicle, explaining:

> [T]he evidence, when viewed in the light most favorable to the prosecution, was sufficient to support Llamas' conviction for felony murder and for criminal

---

[3]    As part of this first ground for relief, Mr. Llamas also relies on Navarro's post-extradition testimony, arguing it "directly refutes the state's 'evidence' that Mr. Llamas aided and abetted Navarro." Doc. 1 at 13–14. The court considers these arguments as part of Mr. Llamas's fifth ground for relief— newly discovered evidence—because this testimony wasn't presented to the Kansas Supreme Court and thus Mr. Llamas can't use it to support his argument that that court's decision was based on an unreasonable determination of the facts in light of the evidence presented.

discharge of a firearm at an occupied vehicle.  Although there was no history of violent attacks between Navarro and Flores, it was well known among Navarro's circle of friends, including Llamas, that Navarro felt a great deal of animosity toward Flores, this animosity was escalating, and Navarro had threatened to kill Flores.  Further, contrary to Llamas' assertion that he never assisted Navarro in his "venture," there was evidence that Llamas had actively assisted Navarro over a several-month period by calling Miller and impersonating the California source and by helping look for Flores.  Then, as the trial court noted, when Llamas got in the car with Navarro on the day of the shooting there was a "long-rifle" in the car.  Michael provided evidence of the length of the rifle and indicated, based on Llamas' account of what happened, that Llamas was aware Navarro had the rifle in the car.  A reasonable juror could conclude from this evidence that Llamas had helped Navarro track Flores with knowledge that Navarro planned to use the rifle if he found Flores.

More significantly, the motel owner told law enforcement officers he saw two men standing at the scene in the parking lot after the shots were fired—one was standing near the driver's side of the Suburban and the other near the driver's side of the Honda.  The owner reported that the man who subsequently entered the passenger's side of the Honda was the one who had been standing near the driver's side of the Suburban.  The second man, who had been standing near the driver's side of the Honda, got into the driver's seat and drove the Honda out of the parking lot.

As the State points out, the jury could have inferred from this evidence that if Llamas was the passenger, he had been standing near the driver's door of Flores' Suburban during the shooting and, thus, assisted in intimidating Flores or blocking Flores' ability to escape.  Alternatively, if Llamas was the person standing near the driver's side of the Honda, he purposefully moved from the passenger's side of the vehicle where he had been riding to the driver's side so that he could drive them away from the scene of the crime.  Either alternative would be an act that aided and abetted the discharge of a firearm at an occupied vehicle.

In addition to this direct evidence that Llamas participated in the action at the scene, there is circumstantial evidence of Llamas' intent to aid and abet Navarro's crimes.  This evidence includes Llamas' participation in the conflict leading up to the shooting, his actions of getting out of and back into the Honda, his actions of accompanying Navarro from the scene, his demeanor at the convenience store while interacting with Navarro and while waiting for his ride after Navarro left the store, and his contact with Navarro after Navarro was in Mexico.  From this circumstantial evidence, a reasonable jury could conclude beyond a reasonable doubt that Llamas formed the intent to aid and abet Navarro as he shot at the vehicle in which Flores sat.  Further, the jury could conclude this intent was formed *before* Llamas moved from the passenger seat of the Honda to either the driver's door of the Honda or the driver's side of the Suburban.

> In summary, when viewed in a light most favorable to the prosecution, there was evidence from which a rational factfinder could find Llamas guilty beyond a reasonable doubt of aiding and abetting Navarro in the commission of the underlying inherently dangerous felony of criminal discharge of a firearm at an occupied vehicle and in the commission of felony murder.

*Llamas*, 311 P.3d at 407–08 (internal citations omitted).

The court finds that this analysis is a "reasonable application" of the standard set forth in *Jackson v. Virginia* and that the facts determined by the Kansas Supreme Court to reach its decision were reasonable considering the evidence presented.  Viewing the evidence in the light most favorable to the prosecution, sufficient direct and circumstantial evidence existed for a rational factfinder to conclude that Mr. Llamas aided and abetted Navarro in committing the felony of criminal discharge of a firearm at an occupied vehicle.  Mr. Llamas's arguments in his first ground for relief invite the court to reweigh the evidence, draw reasonable inferences in his favor rather than the prosecution's, and focus on others' conduct rather than Mr. Llamas's own. But, the court is "not to weigh conflicting evidence or consider witness credibility.  Instead, [the court] must view the evidence in the 'light most favorable to the prosecution,' and 'accept the jury's resolution of the evidence as long as it is within the bounds of reason.'"  *Wingfield v. Massie*, 122 F.3d 1329, 1332 (10th Cir. 1997) (first quoting *Jackson*, 443 U.S. at 319; then quoting *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993)).

Here, Mr. Llamas hasn't met his burden to rebut the presumption that the Kansas court's factual determinations were correct by clear and convincing evidence, nor has he shown the court's decision was objectively unreasonable considering the evidence.  *See* 28 U.S.C. § 2254(e)(1); *Cockrell*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless [it is] objectively unreasonable in light of the evidence presented in the state-court proceeding." (citations omitted)).  And, the evidence presented suffices to allow a rational trier of fact to

conclude Mr. Llamas aided and abetted Navarro.  Thus, Mr. Llamas's claim in ground one fails to establish a basis for federal habeas corpus relief.

### 3.   Conclusion

In sum, Mr. Llamas's reliance on *Rosemond* to argue the Kansas Supreme Court's decision was contrary to or an unreasonable application of clearly established federal law lacks merit because *Rosemond* was not clearly established federal law at the time of the Kansas Supreme Court's decision.  And, Mr. Llamas also hasn't shown that the Kansas Supreme Court's decision that sufficient evidence existed to support his convictions under an aiding and abetting theory unreasonably applied federal law or was based on an unreasonable determination of the facts in light of the evidence presented.

### B.   <u>Ground Two</u>:  The State Trial Court Erred by Limiting the Accomplice Testimony Instruction

Mr. Llamas next argues that the state trial court erred when it failed to instruct the jury that Ruby Camarena—"a key state's witness . . . who was directly responsible for telling Navarro where Flores was on the night of the shooting and who ultimately helped Navarro flee the country"—was also an accomplice to the crimes.  Doc. 1 at 15.  Mr. Llamas asserts that such an accomplice instruction would have caused the jury to consider her testimony more cautiously. *Id.*  And, Mr. Llamas asserts, failing to include Ruby Camarena in the accomplice testimony instruction denied him a fair trial.  *Id.*

The Kansas Supreme Court agreed that the trial court erred by failing to include Ruby Camarena in the accomplice witness jury instruction.  *Llamas*, 311 P.3d at 411.  It found "that there was circumstantial evidence of Ruby's intent to aid and abet the completion of the crime when she relayed the information from Meyers to Navarro."  *Id.*  And, the court found "evidence suggesting [Ruby] knew Navarro planned to hunt down Flores and shoot him if he did not repay

the money, part of which she had provided." *Id.* So, the Kansas Supreme Court concluded, "it was legally and factually appropriate to have included Ruby in the accomplice instruction, and the failure to do so was error." *Id.* But, the court next considered whether the error was harmless. *Id.* at 411–12. And, the court concluded there wasn't a reasonable probability that the error affected the trial's outcome.[4] *Id.*

> The Kansas Supreme Court explained why it concluded the error was harmless:
>
> While Ruby did testify to Llamas' presence at the restaurant and on occasions when Navarro searched for Flores, Michael and Meyers corroborated this in their testimony. Further, they testified that Navarro told many of his friends that he was angry about the drug transaction and that if Flores did not pay him, something was going to happen. They also corroborated Ruby's testimony that Navarro had threatened to kill Flores, although they testified that they did not believe Navarro would do so. In essence, Ruby's testimony about Llamas' role was corroborated by other witnesses. . . . Based on our review of the entire record, we determine there is not a reasonable probability that the error affected the outcome of the trial.

*Id.* at 412.

Mr. Llamas argues the Kansas district court erred by limiting the accomplice instruction testimony—a proposition already endorsed by the Kansas Supreme Court—and this court should reverse his conviction because the district court failed to conform the accomplice instruction to the evidence. Doc. 1 at 15. And, he contends, the Kansas Supreme Court's decision not to reverse his conviction based on the district court's error, "was contrary to, or involved an unreasonable application of, clearly established federal law" set forth in *United States v. Hill*, 627 F.2d 1052 (10th Cir. 1980). *Id.* at 16–17. He asserts that where a conviction is based on uncorroborated accomplice testimony, *Hill* requires a jury instruction about scrutinizing carefully such testimony. *Id.* at 16. And, because Ruby Camarena's testimony was corroborated only by

---

[4]     The Kansas Supreme Court didn't apply the constitutional harmless error standard because Mr. Llamas didn't argue that the error violated a constitutional right, thus abandoning any constitutional harmless error argument. *Id.*

*other accomplices'* testimony, Mr. Llamas argues the Kansas Supreme Court violated clearly

established law in *Hill* when it failed to reverse his conviction once it concluded Ruby should

have been included in the accomplice instruction. *Id.* at 16–17.

      Mr. Llamas relies only on Tenth Circuit decisions, considering appeals from federal

convictions, to argue that the Kansas Supreme Court's decision was contrary to or an

unreasonable application of clearly established federal law. *See Hill*, 627 F.3d at 1053–55

(reversing federal conviction for conspiracy to commit bank robbery because failure to give

accomplice instruction was plain and reversible error where codefendants' testimony comprised

the only evidence of the alleged conspiracy and was not corroborated by other evidence); *United

States v. Owens*, 460 F.2d 268, 269 (10th Cir. 1972) (reversing federal convictions and

explaining "[w]hile one can be convicted on the uncorroborated testimony of accomplices, [the

Tenth Circuit has] held that the [c]ourt must instruct the jury as to the manner in which such

testimony should be considered," and holding that trial court's failure "to give a specific

cautionary instruction on the testimony of acknowledged accomplices . . . was plain and

reversible error"). But, Mr. Llamas's citations to these federal circuit decisions about jury

instructions given in federal criminal cases do not "constitute clearly established federal law for

purposes of 28 U.S.C. § 2254(d)(1)." *Lott v. Trammell*, 705 F.3d 1167, 1190 n.7 (10th Cir.

2013) (citing *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012)); *see also Sedillo v. Hatch*, 445 F.

App'x 95, 103–04 (10th Cir. 2011). Only Supreme Court precedent constitutes clearly

established law for purposes of § 2254(d)(1). *Lott*, 705 F.3d at 1190 n.7. Thus, Mr. Llamas's

arguments that the Kansas Supreme Court's decision contradicted, or unreasonably applied *Hill*

can't provide a basis for federal habeas relief. *Id.*

And as the State notes, Doc. 11 at 18, whether Ruby Camarena was an accomplice as a matter of law is a question of Kansas law, and any state law error doesn't provide a ground for federal relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The Supreme Court repeatedly has warned that "'federal habeas corpus relief does not lie for errors of state law.'" *Id.* at 67 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). Instead, federal habeas review is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. So, the court proceeds to determine whether the Kansas Supreme Court's determination that failing to include Ruby Camarena in the accomplice instruction was harmless violated Mr. Llamas's federal constitutional rights.

Mr. Llamas contends the accomplice instruction error denied his right to a fair trial. Doc. 1 at 15. "'[A]s a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law.'" *Patton v. Mullin*, 425 F.3d 788, 807 (10th Cir. 2005) (quoting *Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997)); *see also Valdez v. Bravo*, 244 F. App'x 864, 868 (10th Cir. 2007) (explaining that "[a] § 2254 petitioner has a heavy burden in attempting to set aside a state conviction based on an erroneous jury instruction" and that the incorrectness of an instruction "under state law is not a basis for habeas relief" (citations and internal quotation marks omitted)). To determine if a jury instruction error rises to the level of a constitutional violation, the court must ask "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)) (further citations omitted); *see also Watson v. Howard*, 123 F. App'x 910, 915, 917 (10th Cir. 2005). In evaluating whether the instruction was so fundamentally unfair that it deprived petitioner of due process, the jury

instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). Finally, "even where the erroneous instruction rises to the level of constitutional error, [the] court must conduct its own harmless error analysis . . . ." *Valdez*, 244 F. App'x at 868.

Under the harmless error analysis, an instructional error amounting to constitutional error still will not warrant habeas relief unless it had a "substantial and injurious effect" on the jury's verdict. *See Fry v. Pliler*, 551 U.S. 112, 119–121 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious' standard . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard . . . ." (citations omitted)); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993); *Taylor v. Workman*, 554 F.3d 879, 893 (10th Cir. 2009).

In short, a petitioner "is entitled to habeas relief" for an erroneous jury instruction only when the erroneous instruction "both (1) so infected the entire trial that the resulting conviction violates due process and (2) had a substantial and injurious effect or influence in determining the jury's verdict." *Valdez*, 244 F. App'x at 868 (citation and internal quotation marks omitted). "Although the two standards overlap and the harmlessness of the error bears on the constitutional question, habeas relief cannot be granted unless the petitioner first establishes a constitutional violation." *Id.* (citation omitted).

Mr. Llamas asserts that the accomplice witness instruction was incomplete because it should have included Ruby Camarena. He argues that the trial court's failure to give this instruction, and the decision of the Kansas Supreme Court affirming his conviction, "was both contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court of the United States, as well as based on [an] unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Doc. 1 at 17. The court is not persuaded by these arguments. Mr. Llamas has not met his heavy burden to show the error so infected his trial such that his conviction violates due process or that it had a substantial and injurious effect or influence in determining the jury's verdict.

As explained above, Mr. Llamas directs the court to no Supreme Court precedent that the Kansas Supreme Court decision contradicted or unreasonably applied. Not only has Mr. Llamas failed to identify any Supreme Court precedent holding that a state trial court's failure to provide a cautionary instruction about accomplice testimony deprives a defendant of a fair trial, but Supreme Court and Tenth Circuit precedent also can't support Mr. Llamas's position. No "constitutional requirement for an accomplice instruction" exists. *Watson*, 123 F. App'x at 917 (holding petitioner hadn't shown the failure to provide such an instruction rendered his trial fundamentally unfair because the jury was instructed about determining witnesses' credibility and trial counsel had cross examined the accomplice and had made arguments at trial about his "possible biases or motives to testify falsely"); *see also Caminetti v. United States*, 242 U.S. 470, 495 (1917) (explaining the Supreme Court has "refused to reverse a judgment for failure to give an [accomplice] instruction" even though it is "the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to such evidence" because "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them"); *Cummings v. Sirmons*, 506 F.3d 1211, 1236–38, 1240–41 (10th Cir. 2007) (holding the absence of an accomplice jury instruction did not deprive petitioner of his right to a fair trial because "it is undisputed . . . that there is no constitutional requirement that the testimony of an accomplice be

23

corroborated by independent evidence" and the alleged instructional error didn't "so infect[ ] the entire trial that the resulting conviction violates due process" (citations and internal quotation marks omitted)); *Foster v. Ward*, 182 F.3d 1177, 1193–94 (10th Cir. 1999) (explaining that while the Tenth Circuit in *Hill* has held that failing to give an accomplice instruction for uncorroborated accomplices' testimony constitutes plain error, the Tenth Circuit "has never considered such an instruction constitutionally mandated," and holding petitioner had not met his "heavy" burden to show that "in the context of the entire trial, the failure to instruct the jury to carefully consider [the accomplice's] credibility . . . had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial" (citations and internal quotation marks omitted)).

Mr. Llamas assumes that the jury shouldn't have believed Ruby Camarena's testimony, and wouldn't have believed it if given a proper cautionary instruction. But, even though the Kansas Supreme Court agreed that the state trial court should have included Ruby Camarena in the accomplice instruction, nothing in the record suggests that her omission from the instruction rendered Mr. Llamas's trial fundamentally unfair. "[I]t remains solely within the province of the jury to determine the credibility of each witness" and Mr. Llamas hasn't shown here that Ruby's testimony was so "incredible on its face" that it can't be believed or that his trial counsel lacked ample opportunity to attack her credibility at trial. *Foster*, 182 F.3d at 1193–94 (citation and internal quotation marks omitted); *see also Watson*, 123 F. App'x at 918. And, as in *Foster* and *Watson*, the trial court instructed the jurors that it was their responsibility to determine the credibility of each witness. *See Foster*, 182 F.3d at 1194; *Watson*, 123 F. App'x at 917–18. In addition to the accomplice instruction for Meyers, the jury received an instruction about how they should determine the credibility of the witnesses generally—Jury Instruction Number Eight.

It read: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness testified." Case No. 09-CR-439, Vol. 1 at 282. The Kansas Supreme Court also found that Ruby Camarena's testimony about Mr. Llamas's role in the crime was corroborated by other witnesses. *Llamas*, 311 P.3d at 412.

In short, Mr. Llamas hasn't met his heavy burden to show that omitting Ruby Camarena from the accomplice instruction rendered his trial so fundamentally unfair that it deprived him of due process. *See Foster*, 182 F.3d at 1193–94; *Watson*, 123 F. App'x at 917. After considering the evidence presented at trial—in the context of the instructions as a whole and the trial record—the court concludes the trial court's failure to include Ruby Camarena in accomplice instruction didn't deprive Mr. Llamas of a fair trial. And, even if the instructional error had amounted to constitutional error, Mr. Llamas also hasn't shown that the error had a "substantial and injurious effect" on the jury's verdict. *See Fry*, 551 U.S. at 119–121. Given the strength of the State's evidence presented at trial, including corroborating testimony from other witnesses, the court concludes that failing to include Ruby Camarena in the accomplice instruction did not have a "substantial and injurious effect" on the jury's verdict. *Id.*

In sum, the Kansas Supreme Court's determination of Mr. Llamas's claim of instructional error neither was contrary to, nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Habeas relief is not warranted on this second ground based on Ruby Camarena's omission from the accomplice instruction.

C. **Ground Three**:  The State Trial Court Erred When It Failed to Include Additional Language About "Mere Association or Presence" in the Jury Instruction on Aiding and Abetting

Mr. Llamas's third ground for relief asserts that the state trial court gave erroneous jury instructions about aiding and abetting.  Like Mr. Llamas's second ground for relief, to the extent Mr. Llamas asserts a state law violation claim he fails to raise a claim upon which federal habeas corpus relief can be granted.  *Estelle*, 502 U.S. at 67.  As noted above, a federal habeas court can consider only those claims challenging a state conviction that violate the Constitution, laws, or treaties of the United States.  *Id.* at 68.

Mr. Llamas again relies on the Supreme Court's 2014 *Rosemond* decision to argue the Kansas Supreme Court's 2013 decision was contrary to or unreasonably applied clearly established federal law.  Doc. 1 at 19, 21–22.  He again contends the evidence can't support a finding that he knew about Navarro's plan or the rifle beforehand.  *Id.*  For the same reasons explained above in ground one, Mr. Llamas cannot rely on Supreme Court precedent decided *after* the Kansas Supreme Court decided his case to support his argument that the state court's decision violated clearly established federal law.  And the evidence, when viewed in the light most favorable to the prosecution, suffices to permit a rational factfinder to conclude that Mr. Llamas aided and abetted Navarro when he committed the felony of criminal discharge of a firearm at an occupied vehicle.

Mr. Llamas also argues he was denied a fair trial because the Kansas district court failed to include his requested language distinguishing between mere association or presence and aiding and abetting.  Doc. 1 at 18–22.  The trial court's aiding and abetting instruction provided:

> "A person who, either before or during its commission, intentionally aids another to commit a crime with the intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the Defendant's participation, if any, in the actual commission of the crime."

*Llamas*, 311 P.3d at 408.  Mr. Llamas asked the court to add the following language:

> "[M]ere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abetter.  To be guilty of aiding and abetting in the commission of the crime the defendant must willfully associate himself with the unlawful venture and willfully participate in it as he would something he wishes to bring about."

*Id.*

The court applies the standard described more fully above in ground two:  that is, a petitioner "is entitled to habeas relief" for an erroneous jury instruction only if the instruction "both (1) so infected the entire trial that the resulting conviction violates due process and (2) had a substantial and injurious effect or influence in determining the jury's verdict."  *Valdez*, 244 F. App'x at 868 (citation and internal quotation marks omitted).  "'A § 2254 petitioner has a heavy burden in attempting to set aside a state conviction based on an erroneous jury instruction.'"  *Id.* (quoting *Nguyen*, 131 F.3d at 1357).  And, the court must consider the jury instruction "in the context of the instructions as a whole and the trial record."  *Estelle*, 502 U.S. at 72 (citation and internal quotation marks omitted).  The court "will not second guess a state court's application or interpretation of state law on a petition for habeas unless such application or interpretation violates federal law."  *Bowser v. Boggs*, 20 F.3d 1060, 1065 (10th Cir. 1994).

Mr. Llamas argues "the trial court's failure to fully instruct" the jury about the difference between mere presence and mere association vis-à-vis aiding and abetting "prevented the jury from carefully considering the evidence" and denied his "right to a fair trial."  Doc. 1 at 18.  He points out that the jury requested a "'layperson' definition of the charges and a definition of aiding and abetting."  *Id.* at 22.  And, he contends, the jury instructions impermissibly allowed the jury to consider whether he aided and abetted the commission of "a crime," rather than specifying that he must have aided and abetted the crime charged—criminal discharge of a

firearm at an occupied vehicle.  *Id.* at 19, 21–22.  Had the trial court instructed the jury "on the difference between mere association or mere presence and willful participation . . . and had the difference between the language 'the crime' and 'a crime' been established[,]" Mr. Llamas contends that "the outcome in this case likely would have been different."  *Id.* at 22.

Mr. Llamas has failed to meet his burden on ground three.  The trial court's failure to include the additional "mere association or presence" language did not so infect the trial that it rendered the resulting conviction fundamentally unfair and it did not have a substantial and injurious effect or influence in determining the jury's verdict.  In reviewing this claim, the Kansas Supreme Court properly examined the context of the record as a whole, and the court finds the Kansas Supreme Court's decision did not violate the Constitution or federal law. Specifically, the Kansas Supreme Court explained its analysis this way:

> Llamas is correct that caselaw supports the content of his proposed instruction. Nevertheless, the official Comment to PIK Crim.3d 54.05 indicates that the trial court may properly refuse to add "mere presence or association" language because the pattern instruction "clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction for aiding and abetting."  This comment is consistent with the holdings of this court in several cases. . . .

> [In *State v. Edwards*, 243 P.3d 683 (Kan. 2010)], we held the trial court did not err in refusing to give an instruction that was nearly identical to the one requested by Llamas.  In asserting error, Edwards argued the additional language was necessary because of his theory of defense, which was that he merely accompanied the others to the victim's house to buy marijuana, without any knowledge of the robbery plan.

> The *Edwards* court acknowledged that the mere association or presence language reflected Kansas law and precisely fit Edwards' defense theory.  And the court went so far as to say that "perhaps the better practice would have been to modify the patterned instruction accordingly."  But the *Edwards* court rejected an argument that error had been committed [because juries are presumed to understand from the pattern instruction's requirement for a person to "intentionally" aid that proving mere presence or association isn't enough to convict a defendant]. . . .

> As in *Edwards*, the mere association or presence language requested by Llamas reflected Kansas law and fit his theory of defense.  But, as our past cases hold, the instruction as given was consistent with and did not foreclose his defense.

Further, while the aiding and abetting instruction did not limit the jury's consideration to only aiding and abetting the criminal discharge of a firearm at an occupied vehicle, the elements instruction indicated that the State had to establish that Llamas "aided and abetted another in the discharge [of] a firearm at an occupied motor vehicle."  When we review claimed instructional error, "we examine the instructions as a whole, rather than isolate any one instruction."  In addition, we presume the jury followed the instructions.  Applying these rules, we reject Llamas' argument that the jury was not clearly informed that Llamas had to aid and abet the commission of the inherently dangerous felony of criminal discharge of a firearm at an occupied vehicle.

Finally, there is no indication the failure to add the mere association or presence language led to a misunderstanding by the jury.  Even though the jury asked for explanations of the elements of the crimes and for a definition of aiding and abetting, the jury's request does not suggest that the jurors were confused about the focus of this issue—that Llamas had to intentionally act in a manner that aided and abetted Navarro's criminal discharge of a firearm at an occupied vehicle.

*Llamas*, 311 P.3d at 409–10 (internal citations omitted).

This court is bound by the Kansas Supreme Court's interpretation of Kansas law.

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (reiterating that "a state court's interpretation of

state law, including one announced on direct appeal of the challenged conviction, binds a federal

court sitting in habeas corpus").  And, the court finds nothing in its analysis demonstrating that

the Kansas Supreme Court applied or interpreted Kansas law in a fashion violating the

Constitution or any federal law.  And, Mr. Llamas hasn't met his heavy burden to show the jury

instructions were erroneous in a manner denying him a fair trial.  He doesn't identify any

Supreme Court precedent requiring mere presence or association language in aiding and abetting

instructions.  Nor has he explained how omitting this language precluded him from presenting

his defense at trial.  As the Kansas Supreme Court explained, the jury instructions, viewed as a

whole, required the jury to find Mr. Llamas acted intentionally and that he aided and abetted the

specific crime charged—discharge of a firearm at an occupied vehicle.  *See* Case No. 09-CR-

439, Vol. 1 at 285 (Jury Instruction No. 11 defining requirements for intentional conduct and

malicious conduct), 287 (Jury Instruction No. 13 requiring that a person "intentionally aid[]" to

be criminally responsible for the crime committed), 290 (Jury Instruction No. 16 requiring as an element of criminal discharge of a firearm at an occupied vehicle that defendant "maliciously and intentionally . . . aided and abetted another in the discharge of a firearm at an occupied motor vehicle"). The jury is "presumed to follow the instructions given." *Valdez*, 244 F. App'x at 869. After reviewing the record and instructions as a whole, the court concludes the asserted instructional error here didn't produce a conviction that violates due process.

Additionally, and even if the court had decided that "the erroneous instruction rises to the level of constitutional error, th[e] court must conduct its own harmless error analysis under *Brecht*." *Valdez*, 244 F. App'x at 868. That is, the court next would have to decide whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (citation and internal quotation marks omitted). Under the *Brecht* harmless error analysis, Mr. Llamas's alleged constitutional error warrants relief only if in light of the record as a whole he can establish that the error "resulted in actual prejudice." *Id.* (citation and internal quotation marks omitted). Here, Mr. Llamas fails to show how the state trial court's refusal to include the additional "mere association or presence" language in the jury instructions substantially affected or influenced the jury's verdict. Mr. Llamas argues that the jury was confused about aiding and abetting and omitting this language from the jury instruction hindered the jury's effort to consider defense—that he was merely present, but did not assist Navarro in the act of shooting Flores. Doc. 1 at 18–19, 21. But, as the Kansas Supreme Court explained, the instruction given to the jury on aiding and abetting was consistent with established Kansas precedent and did not foreclose Mr. Llamas's defense. And, given the strength of the State's evidence presented at trial and the jury instructions and record as a whole, the disputed instruction did not result in actual prejudice against Mr. Llamas.

Mr. Llamas is not entitled to habeas relief on this third ground.

**D.   Ground Four:  Mr. Llamas was Denied his Sixth Amendment Right to Effective Assistance of Counsel at Trial**

Mr. Llamas asserts that his attorney's decision not to offer evidence consisting of surveillance footage hindered Mr. Llamas's defense.  Doc. 1 at 23–24.  Mr. Llamas asserts that this video, captured by a nearby car dealership, could have affected the credibility of the State's witnesses and would have supported his defense theory—that he distanced himself from Navarro's conduct.  *Id.*  Another video from a convenience store, captured after the shooting, showed Navarro and Mr. Llamas arriving at the convenience store at roughly the same time and entering the store together.  *Id.* at 24.  But, this video doesn't depict whether the two men arrived together—*i.e.*, it doesn't show whether Mr. Llamas arrived on foot, in a car, or whether he arrived with Navarro.  *Id.*  Mr. Llamas asserts that his counsel did not thoroughly review the car dealership video, which counsel should have offered into evidence because it helps fill some of the gaps left open from the convenience store video, and, if shown, could have exculpated Mr. Llamas.  *Id.*  Specifically, Mr. Llamas asserts that this surveillance footage supports his claim that he ran from the scene when Navarro began shooting.  *Id.*  Mr. Llamas contends the Kansas Court of Appeals's decision was contrary to, or unreasonably applied the standard for ineffective assistance of counsel adopted in *Strickland v. Washington*, 466 U.S. 668 (1984).  Doc. 1 at 24.

"[I]n a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)."  *Strickland*, 466 U.S. at 698.  "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction" consists of two elements:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not

functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

On the first element—evaluating the alleged deficient performance—"the proper standard for attorney performance is that of reasonably effective assistance."  *Id.*  So, to show deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 687–88.  Under *Strickland*, judicial scrutiny of counsel's performance "must be highly deferential," avoid "the distorting effects of hindsight," and assess counsel's challenged conduct from "counsel's perspective at the time."  *Id.* at 689.  "[A] court must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* at 689 (internal citation and quotation marks omitted).

On the second element—requiring defendant to establish that the deficient performance prejudiced his defense—the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

When a court evaluates an ineffective assistance of counsel claim under the AEDPA, the standard of review is "doubly deferential, because counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citations and internal quotation

marks omitted).  "In such circumstances, federal courts are to afford both the state court and the defense attorney the benefit of the doubt."  *Id.* (citation and internal quotation marks omitted).

Mr. Llamas bases his ineffective assistance of counsel claim on his attorney's failure to offer surveillance video from the car dealership as evidence.  He focuses on Manna's testimony before the state trial court, asserting that because Manna testified he didn't see the figure walking west to east on the video and admitted that the video could have helped corroborate Mr. Llamas's version of events, Mr. Llamas has satisfied both *Strickland* prongs.  Doc. 1 at 24.  Mr. Llamas argues that Manna's initial review of the video "was insufficiently thorough."  *Id.*  And, Mr. Llamas contends, Manna's testimony at Mr. Llamas's § 60-1507 hearing shows that his decision not to play the video at trial wasn't based on trial strategy.  *Id.*  Finally, Mr. Llamas argues that his defense was prejudiced by this deficient performance because the video could have been used to attack the credibility of Mr. Patel's testimony about two individuals leaving in the same car, and would have supported Mr. Llamas's claim that he left the scene separately when the shots were fired, consistent with Mr. Patel's testimony that he also observed a third person in the vicinity of the parking lot near a stairwell and walking east toward a maroon car. *Id.* at 24–25; *see also* Case No. 09-CR-439, Tr. of Jury Trial Vol. II at 153, 164; Case No. 15-CV-09, Tr. of § 60-1507 Hr'g at 14, 45–49 (Aug. 2, 2017).  So, Mr. Llamas contends, the Kansas Court of Appeals's decision finding against his ineffective assistance of counsel claim "was based on [an] unreasonable determination of the facts in light of the evidence presented" and was contrary to, or an unreasonable application of *Strickland*.  Doc. 1 at 25.

The court disagrees.  Instead, the court agrees with the Kansas Court of Appeals's reasoning and concludes Mr. Llamas hasn't met either *Strickland* prong.  In addressing *Strickland*'s first prong, the Kansas Court of Appeals recounted Manna's testimony at the

hearing. *Llamas*, 2018 WL 6005154, at *3–4, 7 (describing how Manna testified that he watched the video "early in the case" but "saw nothing relevant to the case" and when he watched it at the evidentiary hearing on appeal, Manna "could see 'very faintly' the outline of a person moving . . . west to east for a couple of seconds"). Neither he, his co-counsel, nor his investigator saw the faint shadows of an image in the corner of the video when they watched the video to prepare for Mr. Llamas's criminal trial. *Id.* at *3, 7. While Manna admitted, in retrospect, that the video possibly "could have supported the defense theory that Llamas left the scene and walked toward the convenience store," and that he didn't "see a downside to presenting it," Manna also testified he still would have had to address the inconsistent time frame and the video of Navarro and Llamas arriving at the convenience store together. *Id.* at *3–4, 7. Manna conceded, however, "he probably would have played it and let the jury reconcile the inconsistent time frame." *Id.* at *4.

In reviewing these facts, the Kansas Court of Appeals found Mr. Llamas had failed to meet his burden of showing that his attorney was ineffective for not seeking to admit the video. It explained:

> [Mr. Llamas] does not challenge the factual findings of the district court. Instead, he argues that the significance of the convenience store footage was not "proven with overwhelming evidence" to "negate the prejudice" of Manna's failure to admit the car dealership video. We take this to mean the convenience store video is not so overwhelming that it renders the car dealership video meaningless. We are unpersuaded by this confusing argument. . . .

> He argues that Manna's admissions at the hearing sustain his burden on appeal because Manna did not present "potentially exculpatory evidence because his viewing of the video was insufficiently [thorough]." Llamas contends he also met his burden to show prejudice because he was denied the opportunity to provide the jury "a certain level of unbiased evidence to [corroborate] his claims" of running away from the scene and to attack the credibility of the motel owner. We are not so persuaded based on this record.

34

The district court found that the time stamps in the video did not support Llamas' theory that the unidentified individual walking in front of the dealership at 8:25 p.m. could be him and thus bolster his claim that he ran from the scene when the shooting began.  The time line established by law enforcement call logs and the convenience store surveillance footage support the conclusion that Llamas left the convenience store at 8:21 p.m., walking east of the dealership.  Llamas offered no evidence or explanation to account for being captured on the west side of the dealership, also walking east in the direction of the convenience store three minutes after he left that same store.

We note with interest that Manna explained he gave the dealership footage little consideration at the time of Llamas' trial because he saw no evidentiary value in it. The footage was an hour-and-a-half long and he only watched it a couple of times. Likewise, his cocounsel and their investigator also saw the footage, and none of them saw the faint shadow of an image in the corner of the screen at 8:25:25 and again at 8:25:30.

While Manna did acknowledge in retrospect that admitting the footage would have unlikely harmed his case, he believed it would be an issue of what weight the jury would have given the video and he still would have had to address the convenience store footage of Navarro and Llamas arriving together in the context of the time line.  Based on these facts and given the strong presumption that Manna's conduct fell within the broad range of reasonable professional assistance, Llamas failed to show that Manna was deficient under all the circumstances.

Next, we turn to the district court's conclusion that Llamas was not prejudiced by Manna's decision to not admit the dealership footage.  In other words, even if Manna was deficient, Llamas failed to prove he was prejudiced.  The hearing testimony of law enforcement officers showed the time stamps on the dealership footage were about two minutes faster than those consistent time stamps on the convenience store footage, Llamas' cell phone, and the law enforcement call logs. The dealership's footage showed an unidentifiable faint shadow that appeared west of the dealership at 8:25, which compared to the other sources as 8:23.  Since Llamas left the convenience store at 8:21, that gave him only two minutes to run west, beyond the dealership, and then turn back walking east to be captured on the footage at that time and in that place.  But the footage shows that Llamas left the store at 8:21 walking east toward Arby's to meet his ride.

Llamas failed to show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. The dealership footage was not reasonably sufficient to undermine confidence in the outcome.  The district court's conclusions were supported by substantial competent evidence.  The district court is affirmed on this point.

*Id.* at *6–7.

In his present petition for habeas relief in this court, Mr. Llamas raises nearly identical arguments to those raised before the Kansas Court of Appeals. *See* Doc. 1 at 23–25. Mr. Llamas argues that the way the Kansas Court of Appeals resolved those arguments contradicted *Strickland* or unreasonably applied it. *Id.* at 25. But the record supports the Kansas Court of Appeals's findings and it reasonably applied *Strickland* to Mr. Llamas's allegations of ineffective assistance. As *Strickland* makes clear, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations." 466 U.S. at 690–91. Decisions about what evidence to present are strategic decisions left to trial counsel's discretion. *See Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997).

Given the latitude afforded to Manna in making decisions about what evidence to present at trial, and the recognized presumption of reasonable performance, it was reasonable for the Kansas Court of Appeals to conclude that Mr. Llamas failed to meet his burden of demonstrating deficient performance. Manna's performance didn't fall below an objective standard of reasonableness—which the court assesses from counsel's perspective at the time and in the context of the facts of the case, rather than viewed in hindsight. Indeed, on initial review, Manna didn't find the video relevant, and only in hindsight did he testify the video presented a shadowy, unidentified figure and at a time that is inconsistent with Mr. Llamas's defense theory at trial and appearance on the convenience store surveillance video. The Kansas Court of Appeals reasonably applied *Strickland* when it determined that Mr. Llamas failed to establish that he was denied his Sixth Amendment right to effective assistance of counsel or that any prejudice

resulted from his attorney's action.  Mr. Llamas is not entitled to habeas relief on this fourth ground.

E.   <u>Ground Five</u>:  The Trial Court Erred by Holding Mr. Llamas was Not Entitled to a New Trial Based On Newly Discovered Evidence

Finally, Mr. Llamas argues that Navarro's post-extradition statements that Mr. Llamas was not involved in the crimes is newly discovered evidence justifying a new trial, and that the Kansas Court of Appeals erred when it determined he was not entitled to a new trial based on this evidence.  Doc. 1 at 26.  Mr. Llamas asserts Navarro's testimony that Mr. Llamas was unaware of Navarro's plan and was merely a passenger, who left before the shooting occurred, directly refutes the State's aiding and abetting evidence and constitutes newly discovered evidence.  *Id.*  And Mr. Llamas contends habeas relief is warranted because the Kansas Court of Appeals's decision was an abuse of discretion, was based on an unreasonable determination of the facts in light of the evidence presented, and contradicted or unreasonably applied clearly established federal law.  Doc. 1 at 26, 28.  The State argues that this claim lacks merit because Mr. Llamas does not articulate how this purported error resulted in a constitutional violation warranting federal habeas relief, the Kansas Court of Appeals's resolution of the claim was reasonable, and the state court's determination about what constitutes newly discovered evidence is a matter of state law binding on this court.  Doc. 11 at 31–33.  The court concludes that Mr. Llamas isn't entitled to habeas relief on this fifth ground, and explains why below.

A claim based on newly discovered evidence generally does not provide a ground for federal habeas relief unless there was an independent constitutional violation in the underlying trial.  *Clayton v. Gibson*, 199 F.3d 1162, 1180 (10th Cir. 1999) (citing *Herrera v. Collins*, 506 U.S. 390, 400 (1993)).  The Supreme Court has left open the possibility that a "'truly persuasive demonstration of "actual innocence"'" could warrant federal habeas relief, although the threshold

showing "'would necessarily be extraordinarily high.'" *Id.* (quoting *Herrera*, 506 U.S. at 417).

Here, Mr. Llamas never identifies an independent constitutional violation supporting his claim.

Indeed, his underlying appeal in state court focused on whether the Kansas district court abused

its discretion when it applied Kansas law and denied a new trial, and did not raise any federal

constitutional issue.  *See Llamas*, 2018 WL 6005154, at *7–8.  Nor has Mr. Llamas satisfied the

"extraordinarily high" threshold required for a "truly persuasive demonstration" of actual

innocence, given the other evidence presented against him at trial contradicting Navarro's

testimony and the Kansas district court's determination that Navarro's testimony suffers

credibility issues.  *See Love v. Roberts*, 259 F. App'x 58, 64 (10th Cir. 2007) (holding where

newly discovered evidence "conflicts with other evidence in the record . . . and suffers from

credibility issues" it doesn't amount to a "truly persuasive demonstration of actual innocence"

(citation and internal quotation marks omitted)).

  Mr. Llamas also hasn't established by clear and convincing evidence that the Kansas

Court of Appeals unreasonably determined the facts in light of the evidence presented.  As noted

above, a factual determination "made by a State court shall be presumed to be correct" unless

petitioner presents clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); *see*

*also Cockrell*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based

on a factual determination will not be overturned on factual grounds unless [it is] objectively

unreasonable in light of the evidence presented in the state-court proceeding." (citations

omitted)).  And, this court is bound by the Kansas court's interpretation of Kansas law.

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (reiterating that "a state court's interpretation of

state law . . . binds a federal court sitting in habeas corpus").

Kansas law governs what qualifies as newly discovered evidence sufficient to warrant a new trial. *See Janke v. Novac*, 42 F. App'x 107, 111 (10th Cir. 2002) (looking to Colorado state law's requirements for newly discovered evidence claim challenging Colorado conviction raised in § 2254 petition). In Kansas, to establish a right to a new trial based on newly discovered evidence, a criminal defendant must establish: (1) that the evidence could not have been produced at trial with reasonable diligence; and (2) that the newly discovered "evidence is of such materiality that it would be likely to produce a different result upon retrial." *State v. Warren*, 356 P.3d 396, 407 (Kan. 2015) (citations and internal quotation marks omitted). To determine if newly discovered evidence is material, the Kansas trial judge must assess the evidence's credibility. *Id.* On an appeal from a decision denying a motion for a new trial (or a petition for habeas relief), the appellate court (or federal habeas court) does not second guess the trial judge's determination of a witness's credibility. *Glossip*, 530 F. App'x at 742; *Warren*, 356 P.3d at 407; *see also Love*, 259 F. App'x at 60 ("As to the newly discovered evidence claim, we presume the state district court's factual finding that this evidence was not credible . . . to be correct.").

Here, the Kansas trial court concluded Mr. Llamas hadn't presented evidence warranting a new trial because Navarro's testimony was newly available but not newly discovered. Case No. 15-CV-09, *Llamas v. Kansas*, Mem. Decision (Lyon Cnty. Dist. Ct. Sept. 22, 2017) (Vol. 1 at 170–75). The court looked to Kansas case law holding that where a witness is unavailable for trial because the witness invokes her Fifth Amendment right or is a fugitive from justice, but the defendant knows about the witness's involvement before trial and never tries to subpoena the witness or request a continuance, the evidence is not newly discovered but newly available. *Id.* (Vol. 1 at 171–72). The court recognized that some evidence existed that Mr. Llamas knew

where Navarro was in Mexico, but it characterized the evidence about Mr. Llamas's actions to secure Navarro's testimony for trial as "minimal." *Id.* (Vol. 1 at 172). And, the court noted, Mr. Llamas never sought to continue his trial until Navarro was returned to the United States. *Id.* So, it concluded Navarro's testimony was not newly discovered evidence and thus couldn't justify a new trial. *Id.*

The Court of Appeals agreed. It concluded that Navarro's testimony wasn't newly discovered evidence, explaining the record revealed that Navarro "knew that Llamas was convicted of felony murder" but "wrote no letters or statements on Llamas' behalf" and, "[e]ven after his return to Kansas in July 2012" and throughout his own criminal proceedings, Navarro didn't "speak to law enforcement about" or mention Llamas. *Llamas*, 2018 WL 6005154, at *8. Not "until February 2017, more than two years after Llamas filed his [Kan. Stat. Ann. §] 60-1507 motion, and more than four years into his own sentence for felony murder" did Navarro provide a statement for Mr. Llamas. *Id.* Importantly, the court noted that "statements of a codefendant who was known to a defendant, but unavailable at the time of trial, are not 'newly discovered' evidence" where the codefendant refused to testify at trial. *Id.* (citing *State v. Redford*, 804 P.2d 983, 986 (Kan. 1991)). The Court of Appeals explained that even if Navarro hadn't fled to Mexico, Mr. Llamas likely couldn't have compelled Navarro's testimony because Navarro also had pending criminal charges at the time of Mr. Llamas's trial and could have invoked his right against self-incrimination. In short, the Court of Appeals agreed with the district court's conclusion that Navarro's testimony wasn't newly discovered under the standards of Kansas law. *Id.*

Mr. Llamas argues the Kansas Court of Appeals's decision that Navarro's testimony wasn't newly discovered, but rather newly available was wrong. He asserts the court's

conclusion that he "presented only minimal evidence that he acted to secure Navarro's testimony for trial" was an unreasonable determination of the facts because the record includes evidence that Navarro fled to Mexico, and thus Mr. Llamas couldn't have compelled him to testify. *Id.* at 26–27. And, Mr. Llamas argues the record shows he did exercise reasonable diligence to secure Navarro's testimony for his trial because he attempted to learn Navarro's location in Mexico and provided information about Navarro's possible whereabouts to law enforcement. *Id.* at 27–28. Plus, even if he had requested a continuance, Mr. Llamas argues the court wouldn't have allowed an open-ended continuance until Navarro was found. *Id.* at 28.

Mr. Llamas's arguments that he assisted law enforcement's efforts to locate Navarro do not present clear and convincing evidence that the district court's conclusion—Mr. Llamas hadn't shown Navarro's testimony was newly discovered—was wrong. The court recognized that evidence existed that Mr. Llamas knew Navarro was in Mexico and provided this information to law enforcement. And, as Mr. Llamas now argues, the record supports this recognition. Detective Sage testified that Mr. Llamas provided information about Navarro's general whereabouts and Mr. Llamas's uncle's name—who was familiar with the relevant area in Mexico—that law enforcement used in their investigation to help track Navarro. Case No. 15-CV-09, Tr. of § 60-1507 Hr'g at 153–54, 157–58, 162–63 (Aug. 7, 2017).

But, the district court found the evidence that Mr. Llamas had tried to secure Navarro's testimony for trial was minimal. This determination isn't unreasonable considering the evidence presented. No evidence exists that Mr. Llamas asked to continue his trial until Navarro was returned to the United States, regardless whether the court would have granted a continuance. Manna also testified that he recalled Mr. Llamas told law enforcement he could provide information about where Navarro's family lived in Mexico, and the prosecutor had indicated if

Mr. Llamas could provide his exact whereabouts leading to his apprehension they could reach a resolution in Mr. Llamas's case, but "that didn't come to any fruition."  Case No. 15-CV-09, Tr. of § 60-1507 Hr'g at 61–62 (Aug. 2, 2017).  And, Manna agreed that even if Navarro hadn't fled, he likely would have had to waive his Fifth Amendment right to testify because he had criminal charges pending against him.  *Id.* Tr. of § 60-1507 Hr'g at 63.  Detective Sage also testified law enforcement relied on other information from social media and Navarro's girlfriend's activity to locate Navarro.  *See* Case No. 15-CV-09, Tr. of § 60-1507 Hr'g at 159–160 (Aug. 7, 2017).  Finally, Kansas case law supported the Kansas courts' conclusions that the evidence was newly available but not newly discovered when Navarro became willing to testify post-extradition and after accepting a plea.  *Llamas*, 2018 WL 6005154, at *8; *Case* No. 15-CV-09, *Llamas v. Kansas*, Mem. Decision (Lyon Cnty. Dist. Ct. Sept. 22, 2017) (Vol. 1 at 171–72).  This court is bound by the Kansas court's determination about what qualifies as newly discovered evidence. *See Bradshaw*, 546 U.S. at 76; *see also Estelle*, 502 U.S. at 67–68 (explaining "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

Next, even if Navarro's testimony qualified as newly discovered evidence, the trial court concluded a new trial wasn't warranted because Mr. Llamas hadn't satisfied the second prong required by Kansas law—that Navarro's testimony be of such materiality that it likely would have produced a different result upon retrial.  Case No. 15-CV-09, *Llamas v. Kansas*, Mem. Decision (Lyon Cnty. Dist. Ct. Sept. 22, 2017) (Vol. 1 at 172–75).  The Kansas trial court found Navarro wasn't a credible witness, so it was unlikely his testimony would have produced a different verdict for Mr. Llamas.  *Id.* (Vol. 1 at 172).  The Kansas court specified three reasons that Navarro's testimony wasn't credible:  (1) inconsistencies existed between Navarro's

testimony about what he told police and the testimony of the officer who interviewed him, (2) "Navarro's demeanor and the manner in which he testified" led the court to question the truthfulness of information provided because it appeared to the court that he was "intent upon clearing Mr. Llamas from any responsibility no matter the questions . . . asked of him[,]" and (3) Navarro's recollection of events contradicted Mr. Llamas's statements to others about Mr. Llamas's actions the night of the shooting. *Id.* (Vol. 1 at 174). The Court of Appeals affirmed this decision. *Llamas*, 2018 WL 6005154, at *8–9. And, though it did not "reassess [the trial] judge's determination of credibility[,]" it agreed that "the record reflects Navarro's testimony is replete with contradictions, both with the evidence established at trial and even within his own testimony at the [Kan. Stat. Ann. §] 60-1507 hearing." *Id.* at *8.

Mr. Llamas argues the Kansas trial court's credibility determination "is absurd." Doc. 1 at 29. In his view, any contradictory testimony or demeanor relied on by the Kansas court to determine Navarro wasn't credible was caused by issues with Navarro's translator paraphrasing questions and Navarro experiencing difficulty understanding the questions asked. *Id.* But, after reviewing the record, the court concludes that the trial court's credibility assessment was objectively reasonable in light of the evidence presented. It is true that the trial judge asked the translator a couple of times not to explain the questions, but simply repeat what was asked or permitted a question to be repeated if it appeared Navarro hadn't understood the question asked. *See* Case No. 15-CV-09, Tr. of § 60-1507 Hr'g at 89, 100, 106 (Aug. 2, 2017). But, Navarro had worked with the translator before and testified he was able to understand her translations. *Id.* Tr. of § 60-1507 Hr'g at 82–83. And other than the few instances referenced above, Navarro provided responses to the questions asked and didn't indicate he had any problems understanding the translations. The record also reflects the trial court made its credibility determination after

taking into account the fact that Navarro was using an interpreter to testify. *See* Case No. 15-CV-09, *Llamas v. Kansas*, Mem. Decision (Lyon Cnty. Dist. Ct. Sept. 22, 2017) (Vol. 1 at 174). And, the record supports the trial court's reasoning explaining why it didn't find Navarro's testimony credible. In short, Mr. Llamas doesn't establish that the state court's credibility determination was unreasonable by clear and convincing evidence. Instead, he invites this court to assume the district court was wrong and impermissibly make its own credibility determination. Federal law doesn't permit the court to accept this invitation. This court cannot second guess the state court's credibility determinations. *See Glossip*, 530 F. App'x at 742.

Finally, Mr. Llamas hasn't identified any clearly established federal law contradicted or unreasonably applied by the Kansas Court of Appeals. Mr. Llamas argues the Kansas Court of Appeals's decision that Navarro's testimony wouldn't be likely to produce a different result is contrary to or unreasonably applies *United States v. Trujillo*, 136 F.3d 1388 (10th Cir. 1998). Doc. 1 at 28–29. *Trujillo* is a Tenth Circuit case, not Supreme Court precedent, and thus doesn't qualify as clearly established law for purposes of § 2254(d)(1). *Lott v. Trammell*, 705 F.3d 1167, 1190 n.7 (10th Cir. 2013) (citing *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012)); *see also Sedillo v. Hatch*, 445 F. App'x 95, 103–04 (10th Cir. 2011). And, even if the Supreme Court had decided *Trujillo*, it involved a direct appeal from a conviction in federal court, so it applied the Tenth Circuit's test "for determining whether a defendant should be granted a new trial based on newly discovered evidence." *Trujillo*, 136 F.3d at 1394. As explained above, Kansas state law provides the standard for newly discovered evidence sufficient to warrant a new trial in a state criminal case. *See Janke*, 42 F. App'x at 111. The Kansas Court of Appeals properly applied Kansas law when it reviewed Mr. Llamas's § 60-1507 motion. And Mr. Llamas hasn't identified

any Supreme Court precedent that the Kansas standard contradicts or that the state court unreasonably applied.  Nor does the state court's analysis contradict *Trujillo*.

The Tenth Circuit standard is similar to Kansas law's requirements.  It "requires the alleged newly discovered evidence [to] be[:]  (1) more than impeaching or cumulative, (2) material to the issues involved, (3) such that it would probably produce an acquittal, and (4) such that it could not have been discovered with reasonable diligence and produced at trial."  *Trujillo*, 136 F.3d at 1394.  Mr. Llamas contends he could satisfy the Tenth Circuit standard because Navarro's testimony was more than impeaching or cumulative.  Doc. 1 at 29.  He also asserts the evidence was clearly material and justifies a new trial because, "[i]f true, it proved Mr. Llamas knew nothing of Navarro's intentions with Flores" and thus it "would likely have produced an acquittal."  *Id.*  Unlike the evidence at issue in *Trujillo*, Navarro's testimony is exculpatory.  *See Trujillo*, 136 F.3d at 1395–96.  But, *Trujillo* doesn't hold that any exculpatory evidence is likely to produce an acquittal.  Instead, under the Tenth Circuit standard, a defendant must show both that the evidence was material *and* that it would probably produce an acquittal.  *See id.*  Mr. Llamas doesn't explain how the Kansas courts' decisions contradicted or unreasonably applied this standard.  Indeed, he merely argues the state trial court's conclusion that Navarro's testimony wasn't likely to produce a different result must be wrong because, he contends, Navarro's testimony was credible.  As already discussed, this court cannot second guess the Kansas trial court's credibility determination and the Kansas decisions weren't unreasonable determinations of the facts in light of the evidence presented.

Mr. Llamas's fifth ground fails to state a claim permitting federal habeas relief.

**IV.     Conclusion**

For reasons explained, Mr. Llamas has failed to meet his burden for habeas relief on any of the five grounds raised here.  The Kansas Supreme Court, the Kansas Court of Appeals, and the Kansas trial court made decisions that are consistent with clearly established federal law.  And, the decisions were based on reasonable determinations of the facts considering the evidence presented.

**V.     Certificate of Appealability**

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Although this standard does not require a movant to demonstrate that his appeal will succeed, he must "prove something more than the absence of frivolity or the existence of mere good faith."  *Cockrell*, 537 U.S. at 338 (citation and internal quotation marks omitted).  "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims.  In fact, the statute forbids it."  *Id.* at 336.  To satisfy this standard, the movant must demonstrate that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"  *Saiz v. Ortiz*, 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke*, 542 U.S. 274, 282 (2004)).

The rulings that the court has made here are not the type that reasonable jurists could debate or would conclude were wrong.  The court thus declines to issue a certificate of appealability for the five grounds decided in this Order.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Samuel Llamas's Petition for Writ of Habeas Corpus (Doc. 1) is denied.

**IT IS SO ORDERED.**

**Dated this 8th day of January, 2021 at Kansas City, Kansas.**

<u>s/ Daniel D. Crabtree</u>
**Daniel D. Crabtree**
**United States District Judge**